UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOSEPH S. BARBAGALLO,
                              Plaintiff,

        – against –

MARCUM LLP, JOHN DOES 1-9,
                              Defendants.

**MEMORANDUM,
FINDINGS OF
FACT,
CONCLUSIONS OF
LAW, AND
JUDGMENT**

11-CV-1358

MARCUM LLP,
              on Counterclaims, and as
              Third-Party Plaintiff,

        – against –

JOSEPH S. BARBAGALLO,
              on Counterclaims, and

CITRIN COOPERMAN & COMPANY, LLP,
              as Third-Party Defendant

**Appearances:**

For plaintiff:                  Derek Eddy
                                Fellheimer & Eichen, LLP
                                45 Rockefeller Plaza
                                Suite 2000
                                New York, NY 10111


For defendant:                  John Houston Pope
                                Epstein Becker & Green, P.C.
                                250 Park Ave.
                                New York, NY 10177-1211

                                Raymond T. Mak
                                Epstein Becker & Green PC
                                250 Park Avenue

New York, NY 10177


For third-party defendant:          Frank Christian Welzer
                                    Zuckerman Gore & Brandeis LLP
                                    11 Times Square
                                    New York, NY 10036


**JACK B. WEINSTEIN, Senior United States District Judge:**

I.      Introduction ................................................................................................... 2

II.     Findings of Fact ............................................................................................ 4

III.    Procedural History ...................................................................................... 14

IV.     Choice of Law: New York........................................................................... 15

V.      Barbagallo's Claims................................................................................... 17

    A.      ERISA ................................................................................................. 17

    B.      Breach of Contract: Retirement Benefit, PTO, and Commissions...................... 18

VI.     Marcum's Counterclaims ............................................................................ 31

    A.      Breach of Contract .............................................................................. 31

    B.      Breach of Loyalty and Fiduciary Duty................................................. 36

    C.      Marcum's Remaining Claims: Negligence and Reformation ............................. 40

VII.    Conclusion................................................................................................... 40

### I.      Introduction

        With the consent of the parties the claims of plaintiff Joseph S. Barbagallo ("Barbagallo")

and defendant and counterclaim plaintiff Marcum LLP ("Marcum") were tried without a jury.

*See* Fed. R. Civ. P. 52(a)(1).  After assessing credibility and reviewing the documents the court

sets forth below its factual findings and legal conclusions and applies the law to the facts.  *Id.*

Neither party can recover.

        Either party may move within twenty days to "question the sufficiency of the evidence

supporting the findings" or on any other ground, and may request changes in any portion of this

memorandum.  *See* Fed. R. Civ. P. 52(a)(5).

2

The case is brought by an experienced, independent, certified forensic accountant, Barbagallo, with a substantial number of his own long-time clients. During the space of a few years, he left his private practice to enter an accounting firm, Margolis & Company P.C. ("Margolis"); then left that firm to join another, Marcum; he left Marcum to join Citrin Cooperman & Company, LLC ("Citrin"); and then left Citrin to resume his own independent practice. In each of these large accounting firms, he was a non-equity partner. At each move he took his original clients with him.

Two principles affecting employment of professionals in partnerships are revealed: first, when a deal among professionals for services turns sour, it is usually best to promptly terminate the relationship without recriminations and litigation; and, second, well advised clients will usually follow the talent—that is the professional they trust—rather than the organizations to which their adviser temporarily attaches himself.

Barbagallo claims that, pursuant to their employment agreement, Marcum owed him a substantial retirement benefit, along with other payments, when he left the firm for Citrin. He alleges that Marcum's failure to make these payments, particularly the retirement benefit, constituted a breach of their employment agreement and a violation of the Employee Retirement Income Security Act (ERISA). Marcum denies that it has any monetary obligations to the plaintiff. It counterclaims against Barbagallo, asserting that the plaintiff is liable, in contract and in tort, for misconduct while an employee of the firm and for impermissibly taking client business with him to his subsequent employer, Citrin.

Initially Citrin was a party to the litigation.  Marcum accused Citrin of taking Marcum clients when it employed the plaintiff.  Citrin has reached a settlement with Marcum and Barbagallo.  The latter parties remain in the litigation.

## II.    Findings of Fact

1.    Joseph Barbagallo is a certified public accountant in Pennsylvania.  He practiced accounting on his own from 1976 until March 2003, when he joined Margolis & Company P.C. ("Margolis") as a non-equity partner. Trial Tr. ("Tr.") 416-17, Nov. 30, 2012.  At Margolis, located in Pennsylvania, the plaintiff performed a mix of forensic and tax-related work for individuals and businesses.  *Id.*; Tr. 62, Nov. 27, 2012.  He brought to Margolis his own clients. *See* Marcum Trial Exhibit ("Def. Ex.") 265. Six more clients were acquired by him while he worked for Margolis.  Tr. 759:18-23, Dec. 13, 2012.

2.    On September 1, 2009, Margolis effectively merged with Marcum, whose principal place of business was in Melville, New York.  *See* Tr. 697-98, Dec. 12, 2012; Tr. 776.  Along with other Margolis partners, Barbagallo moved his clients to Marcum.  He was one of three Margolis partners to join Marcum as a non-equity partner.  Barbagallo remained at Marcum from September 1, 2009 until October 31, 2010 when he went to Citrin.  Tr. 62.

3.    In September of 2009, he entered into a non-equity partnership agreement ("Agreement") with Marcum.  *See generally* Plaintiff's Trial Exhibit ("Pl. Ex.") 1.  The Agreement superseded his prior contract with Margolis.  It governed the scope of his employment relationship with Marcum and is the central document.

4.    The Agreement is comprehensive.  It contains a number of terms that are common to the agreements for the two other Margolis principals who, like Barbagallo, joined Marcum as non-equity partners.  It also contains language governing compensation that is individually

tailored for each non-equity partner. Barbagallo was entitled to a base annual salary of $183,625, approximately $15, 302 per month. Pl. Ex. 1, § 5.1a. The Agreement covered a wide variety of matters, including benefits, the services he was to provide at Marcum, and his obligations as a non-equity partner. Some of these contract provisions are at the heart of the present dispute, which centers on the circumstances surrounding plaintiff's move from Marcum to Citrin in October of 2010.

5. The plaintiff claims that upon withdrawing from Marcum, he was owed a number of payments, principally a retirement benefit under Section 15.1 of the Agreement. This provision states: "*In the event that the Non-Equity Partner withdraws voluntarily* from Marcum or is involuntarily terminated by Marcum during the term of this Agreement *he shall be entitled to the Retirement Earnings Benefit* as provided for in this Agreement." Pl. Ex. 1, § 15.1 (emphasis added). The defendant's position is that under Article X, which primarily governs retirement benefits, Barbagallo should have provided Marcum with "twelve (12) months prior written notice of his intent to retire," which he did not do. *See* Pl. Ex. 1, § 10.3.

6. Barbagallo claims that since he voluntarily withdrew, and did not retire, Section 14.1 of the Agreement governs. That provision required him to provide only ninety days written notice. *See* Pl. Ex. 1, § 14.1. He gave ninety days notice. In addition to a retirement benefit, plaintiff also asserts claims for unused Paid Time Off ("PTO"), under Article VII of the Agreement, and for unpaid client commissions, pursuant to the 2009 Marcum Philadelphia Office Employee Handbook.

7. Marcum's position is that under the contract, plaintiff is not entitled to any of these benefits. One counterclaim alleges that when Barbagallo left the firm for Citrin, he breached Article XIII of the Agreement—the liquidated damages provision for the Agreement's non-

5

compete covenant—by taking some client business without paying Marcum the required fee. Barbagallo contends that he did not run afoul of Article XIII and therefore does not owe any payments. Marcum's two other counterclaims for breach of loyalty and fiduciary duty, and for negligence, stem from the plaintiff's conduct with respect to one particular client matter and to the overall performance of his job.

8. Although as part of their cases both parties dispute the interpretation and application of various contractual provisions, evidence established controlling facts about the legal effect of Barbagallo's conduct while employed at Marcum that bear directly on the resolution of this case.

9. During his stay at Marcum, Barbagallo primarily focused on forensic investigations and business valuations. He brought to Marcum his prior clients, including the six he had acquired while at Margolis. Tr. 760-61.

10. There was one client that Barbagallo acquired with the assistance of Marcum, but then concealed from this employer—the Tuscano account. With an eye on his imminent— though unannounced departure—to Citrin, *but while still a paid employee of Marcum*, Barbagallo covertly engaged and began working on this matter on behalf of Citrin, his next employer—ultimately taking the Tuscano client with him to that firm.

11. The trial testimony of a number of witnesses—chiefly the plaintiff himself, the client, Richard Tuscano, his attorney, Scott Unger, and Gary Karlitz, the practice leader of Citrin's valuation and forensic group—collectively establishes the chronology with regards to Barbagallo's acquisition of the Tuscano matter and how it interacted with his employment at Marcum.

12. In February of 2010, Barbagallo met Scott Unger, an attorney from the law firm of Stark & Stark, at a Marcum-sponsored reception. Tr. 499-501, Dec. 11, 2012. The purpose of

the networking event was to explore business opportunities between the two firms. The following month, on March 12, 2010, Unger emailed Barbagallo and David Glusman, head partner of Marcum's Philadelphia office and member of the firm's management committee. Unger contacted them to discuss a prospective client who might require the assistance of an accounting expert for a business valuation. Def. Ex. 221. At the time, Barbagallo was a non-equity partner at Marcum and had no plans to leave the firm.

13. After receiving the email, Barbagallo informed Glusman that he would work on the prospective matter. *Id.* Ex. 222. Glusman was not further involved with the account. Barbagallo became the sole Marcum contact. On March 12, the same day he received Unger's email, Barbagallo spoke with Unger about the potential client, Richard Tuscano, and Tuscano's personal accountant. *Id.* Ex. 223. It seemed likely to all of them that Tuscano would enlist his services. So Barbagallo sent them his resume, qualifications, history as an expert witness, and general information about Marcum. He also requested background information about the matter in order to run a conflicts check at Marcum. *Id.*; Tr. 507:11-508:13.

14. The Tuscano matter involved litigation between Richard Tuscano and his brother regarding a family business, Northeastern Import-Export, Inc. ("Northeastern"). Unger represented Richard Tuscano. At the time that Unger and Barbagallo first spoke in late winter of 2010, there had not been any litigation; Richard Tuscano commenced his action in May of that year. Tr. 521; Def. Ex. 228 (email from Scott Unger to Barbagallo attaching complaint). From March through May, Barbagallo spoke and met with Unger, Tuscano, and Tuscano's accountant, on a number of occasions to discuss Marcum's potential engagement, through which Barbagallo would serve as a forensic accountant in the litigation. Tr. 510:2-515:15; Tr. 432. Barbagallo spent some 20 hours of Marcum time cultivating this account. Tr. 510:2-9, 516:1-4.

15.  On May 25, 2010, Barbagallo sent Unger the Marcum engagement letter.  Tr. 516-17; Def. Ex. 231.  The letter purported to engage Marcum as a firm and did not mention Barbagallo by name.  Tr. 517:2-4.  At this time, Barbagallo had no intention of leaving Marcum. Tr. 515:22-516:11.

16.  The Marcum engagement letter was never signed, nor did Barbagallo make any efforts to obtain Tuscano's signature.  He never opened a "new matter" at Marcum for the Tuscano engagement; he did not record any billable time for it.  Tr. 532.  The one hour of nonbillable time he attributed to obtaining this matter, on June 8, 2010, was the last recorded entry mentioning this engagement on plaintiff's Marcum timesheets.  *See* Marcum Proposed Findings of Fact and Conclusions of Law After Trial ("Def. Post-Trial PFFL") at 7, Dec. 21, 2012, ECF No. 178; Def. Ex. 204.  The Tuscano litigation was dormant for most of the summer of 2010, at least with respect to Barbagallo's involvement.

17.  On the invitation of a corporate recruiter, over late June and July of 2010, Barbagallo conversed with Citrin about joining this accounting firm.  Tr. 421:10-23.  Citrin is a large New York City-based accounting firm that competes directly with Marcum in the New York City and Philadelphia metropolitan areas.  *See* Marcum's Amended Ans., Counterclaims, and Third-Party Compl. ("Amended Ans.") ¶ 140, Sept. 22, 2011, ECF No. 36.  Barbagallo had a number of interviews with partners at Citrin, including those in their Philadephia office.  Citrin offered to compensate Barbagallo at a base level of $255,000, a substantial increase from his salary at Marcum.  Tr. 422:19-21.

18.  On July 23, Joel Cooperman, managing partner of Citrin, reached an agreement with plaintiff for a position as a non-equity partner and sent Barbagallo the proposed agreement for

his signature. Tr. 145:18-146:14; Def. Ex. 217. On the same day, Barbagallo personally handed

a ninety-day notice of resignation to David Glusman of Marcum. Tr. 422:25-423:5. It stated:

> This is to inform you that in accordance with section 14.1 of my agreement with
> Marcum LLP, I wish to terminate my relationship with and services to Marcum. Under
> that section I am required to give 90 days notice. I am willing to extend the 90 day
> period if you feel it is necessary for a smooth transition. I am also willing to leave prior
> to 90 days if we reach a mutually acceptable date. I appreciate having been associated
> with Marcum and would like to make the transition as smooth as possible.

Pl. Ex. 92.

19. Glusman accepted Barbagallo's resignation, requesting that the plaintiff spend his

ninety-day notice period attending to his client accounts, issuing bills for work already

performed, and collecting outstanding account receivables. Tr. 714-16. Barbagallo agreed.

20. Despite Glusman's repeated requests at their meeting, Barbagallo refused to disclose

the identity of his new employer, but misled Glusman with the assurance that it would not be a

competing accounting firm. Tr. 714-15; Tr. 72:13-25. Barbagallo did not tell Glusman about his

agreement with Citrin until he was already there. Tr. 75:17-76:3.

21. On August 2, a little more than a week after Barbagallo announced his resignation

from Marcum, Citrin received his signed partnership agreement and started preparing for the

plaintiff's arrival at the firm. Tr. 152, Nov. 28, 2012; Def. Ex. 218.

22. About this time, the Tuscano matter became more active. With his new employment

agreement finalized, and in anticipation of joining Citrin after the ninety-day notice period

ended, the plaintiff used the new activity in the Tuscano matter as his opportunity to divert the

account to his prospective employer, Citrin, in August of 2010. This was done despite Citrin's

instructions to the plaintiff not to disrupt Marcum's client base. Tr. 165-66.

23. On August 9, Barbagallo met with Richard Tuscano. Expecting a significant amount of work on this matter in the near future because of litigation developments, Barbagallo informed the client that he would soon be leaving Marcum for Citrin. Tr. 439, 527. Barbagallo did not ask Tuscano for his consent to move the engagement to Citrin. Tr. 292, Nov. 29, 2012. At their meeting, Barbagallo told Tuscano that he would ask Citrin to run a routine check for any conflicts at the firm. Tr. 440:15-23.

24. On August 9, while still an employee at Marcum, Barbagallo notified Gary Karlitz, the practice leader of Citrin's valuation and forensic group, of the Tuscano account. He stated that Tuscano was a client he wanted to bring to Citrin and engage as a partner there. And he requested an engagement letter from Citrin. Tr. 350-53. *See* Def Ex. 232 ("[O]ur client would be Richard Tuscano…."). From his personal email address, the plaintiff provided Karlitz with the basic information about the Tuscano matter, the identity of the client and the corporate entities involved. Tr. 352-53; Def. Ex. 232. He led Karlitz to believe he had not dealt with the client before, never disclosing that he had been working intermittently on this matter over the last five months or that he had previously submitted to Richard Tuscano a proposed Marcum engagement letter. Tr. 351:17-352:2.

25. On August 10, the day after learning from Barbagallo about his new client, Karlitz performed a conflicts check at Citrin, emailing to the firm information about the Tuscano litigation and the parties involved. Tr. 355-56; Def. Ex. 234. Later that day, in response to Barbagallo's request, Karlitz provided the plaintiff with a proposed Citrin engagement letter for this matter. Tr. 357; Def. Ex. 235. The letter contained the requisite information about the client, Richard Tuscano, and his lawyer, Scott Unger, who facilitated the engagement. Tr. 351:1-7, 357; Def. Ex. 235. It required only Tuscano's signature to be complete. It engaged Citrin as

a firm, listed Karlitz as the partner in charge of the matter, and did not mention Barbagallo. Tr. 357; Def. Ex. 235.

26.   Karlitz assumed that Citrin could properly engage Tuscano because Barbagallo informed Karlitz that he had disclosed the matter to Marcum; that Marcum had no issue with it; and that he would be joining Citrin very soon anyway. Tr. 358-59. Barbagallo presented the engagement letter to Tuscano. Tr. 441:5-21. He mentioned to Tuscano that the letter would not list the plaintiff by name because he was not yet at Citrin. *Id.* But Barbagallo still did not disclose the Tuscano matter to anyone at Marcum, nor did he obtain the permission of Marcum's managing partner to engage the client through Citrin. Tr. 527:17-24, 536:19-23.

27.   Although Citrin was under the impression that Barbagallo would start shortly after resigning from Marcum, plaintiff kept pushing back the date through September and October of 2010. Tr. 345-50. Citrin continued to make preparations for his arrival, but there was uncertainty about when that would be. *See id*.

28.   During September, because of a court order in the Tuscano litigation, Barbagallo began to work more intensely on the matter. He reviewed document requests in the litigation and communicated with Scott Unger, Tuscano's lawyer, about relevant work on the case, including preparing for an upcoming document inspection. Tr. 243-44, 268-69, 454-60; Def. Exs. 238-42.

29.   The inspection occurred on October 5 and 6 at Northeastern's company headquarters in Bohemia, New York. Tr. 460-61; Def. Exs. 252-53. Barbagallo performed the review on-site, along with David Anderson, a former Marcum employee who had just transferred his employment from Marcum to Citrin. Tr. 460-61; Def. Exs. 252-53.

30.  At Barbagallo's request, and assuming that the plaintiff was soon to join the firm, Citrin accelerated Anderson's hiring schedule so he could start working on the Tuscano matter, particularly the document inspection under Barbagallo's supervision.  Tr. 360-65; Def Exs. 243-44.

31.  Within two weeks after the inspection, Barbagallo and Anderson submitted certifications to the court in the Tuscano litigation, describing their document review and analysis.  Tr. 533; Def. Ex. 252.  Barbagallo spent substantial time putting together and reviewing his certification, along with Anderson's, and consulting with Tuscano's lawyer before the certifications were submitted to the court.  Tr. 538:5-13; Tr. 258-261; Def. Ex. 252.

32.  In his certification, Barbagallo did not disclose that he was employed by Marcum. According to his own testimony, his reason for not doing so was because he "wasn't signing this as a partner of Marcum."  Tr. 537:13-15.

33.  In total, Barbagallo spent at least six days in October on the Tuscano document inspection and follow-up work.  Tr. 547-48.  For the two days when he performed the on-site inspection in New York, Barbagallo recorded his absence as "vacation" on his Marcum timesheet.  Tr. 461:19-21; Def. Ex. 204, at 46.  During October, he also performed other work in the Tuscano litigation, including reviewing the opposing party's certifications and drafting responses.  Tr. 261, 547-48.

34.  Plaintiff never billed any of his work on the Tuscano matter through Marcum. Tuscano testified that he never signed an engagement letter with Marcum, never received a bill from it, and never made any payments to that firm.  Tr. 306:4-13; Tr. 299:19-24.

35. On November 17, 2010, Tuscano received a bill from Citrin for the work performed in October.  Tr. 297; Def. Ex. 257.  This was the first invoice he received listing billable work on

this matter, with October 1, 2010 as the first work date. Tr. 299:6-18; Tr. 30; Def. Ex. 257. The bill did not list any time for Barbagallo's work in October, despite the substantial efforts he had put into the case that month. Def. Ex. 257; Tr. 545:14-18. The only mention of his name is tangentially in Anderson's billable entries, where he records traveling to Barbagallo's house for work regarding the document inspection. Def. Ex. 257; Tr. 581.

36. The November bill also credited Tuscano for the $7,000 retainer fee he had paid to Citrin in order for Barbagallo and Anderson to begin work on the matter. Def. Ex. 257; Tr. 312:4-10. The retainer fee was the same amount that Barbagallo intended Tuscano to pay to Marcum in May of 2010 when he initially thought he would, but never did, bill the matter to Marcum. Tr. 525:13-19; Def. Ex. 231. By his own admission, when the plaintiff decided to shift charges to Citrin, he instructed Tuscano to direct the retainer fee to his prospective employer. Tr. 525:13-19.

37. On plaintiff's direction, Tuscano paid the retainer to Citrin in October, while Barbagallo was still an employee of Marcum. Tr. 312:4-10.

38. Barbagallo left Marcum on October 31, 2010. He started at Citrin on November 1. Although he had given ninety-days notice of his resignation to Marcum, he had remained there for a total of 100 days. Tr. 449:17-20.

39. During this 100-day period, in addition to working on the Tuscano matter, Barbagallo actively attempted to collect Marcum's outstanding account receivables, transitioned a number of clients staying behind at Marcum, and performed accounting and tax work and other tasks for Marcum. Tr. 425-30, 647-51.

40. Upon leaving Marcum, the only client that Barbagallo took with him to Citrin that he had acquired during his time there was an individual, Dorothy Snyder, for whom Marcum had

not done any billable work in the prior year.  Tr. 760-61; Def. Ex. 262; Pl. Barbagallo's Post-Trial Proposed Findings of Fact and Conclusions of Law ("Pl. Post-Trial PFFL") ¶ 183, Dec. 21, 2012, ECF No. 177; Pl. Ex. 130.  All of the other clients that Barbagallo took with him to Citrin were ones he had acquired at Margolis or before that when he was self-employed.  Tr. 813-15; Pl. Post-Trial PFFL ¶ 182.

41.  Barbagallo worked at Citrin for approximately fourteen months, continuing to service the Tuscano matter in addition to other clients.  Tr. 169:18-20, 468.  He resigned from Citrin on January 6, 2012 because of irreconcilable differences over Citrin's involvement in the present litigation.  He returned to his own private practice.  *See* Tr. 169-71.

42.  In December of 2010, after he had started working for Citrin, Barbagallo submitted a letter to Marcum requesting payment of his retirement benefit pursuant to Section 15.1 of the Agreement.  On December 6, 2010, Marcum denied his claim by letter, stating that he was not entitled to the benefit because of his failure to provide twelve months notice of retirement pursuant to Section 10.3 of the Agreement.

### III.  Procedural History

43.  Barbagallo filed suit against Marcum on March 18, 2011 alleging breaches of the Agreement by Marcum's refusal to pay him retirement benefits, unused paid time off, unpaid client commissions, and bonuses.  Compl., Mar. 18, 2011, ECF No. 1.  In connection with the retirement benefit, Barbagallo alleged claims under ERISA, 29 U.S.C. § 1001 *et seq. Id.*

44.  Marcum counterclaimed, asserting a number of claims in tort and contract against Barbagallo.  Amended Ans. ¶¶ 160-93.  Marcum also sued Citrin, alleging in substance that that firm assisted Barbagallo in diverting client business, as well as confidential client information, to Citrin.  *See id.* ¶¶ 194-215.  Citrin, in turn, cross-claimed against Barbagallo, seeking, among

other things, indemnification and contribution. Citrin's Amended Cross-Claim, April 12, 2012, ECF No. 60. And Barbagallo filed a counterclaim for unjust enrichment against Citrin. Barbagallo's Amended Ans. With Counterclaim to Citrin's Amended Cross-Claim, June 4, 2012, ECF No. 78. Distilled over the course of the parties' voluminous filings, including their motions to dismiss and for summary judgment, were their claims against each other. *See* Memorandum and Order ("First Order"), Oct. 25, 2011, ECF No. 39; Memorandum and Order ("Second Order"), May 11, 2012, ECF No. 72; Hr'g. on Mots. for Summ. J., Nov. 9, 2012.

45. A bench trial was scheduled for the surviving claims between Barbagallo and Marcum, followed on a trailing calendar by a jury trial for the parties' remaining claims involving Citrin. *See* First Order. On the first day of of the bench trial, Citrin settled with Marcum and Barbagallo. Tr. 4-5; Stipulation and Order of Dismissal, Dec. 7, 2012, ECF No. 167.

46. Barbagallo tried the following causes of action: 1) violations of ERISA for failing to pay the benefit and breaching fiduciary duties; and 2) breach of contract for his alleged retirement benefit, unpaid commissions, and unused PTO. Marcum tried the following counterclaims: 1) breach of contract regarding the non-compete covenant (Section 13.1 of the Agreement); 2) breach of fiduciary duties; 3) negligence; and 4) contract reformation.

## IV.     Choice of Law: New York

47. New York law applies to all of the parties' claims. The causes of action in contract are governed by the Agreement's New York choice-of-law clause. Pl. Ex. 1, § 21.1(a).

48. With respect to the tort allegations, pursuant to the parties' intentions, New York law also applies. The parties consented to application of New York law at the outset of the litigation. First Order, at 6 ("In deciding the state law claims, New York law will be applied….Although

the parties have not addressed what law should be applied to the tort claims raised, they have assumed in their papers that New York law would govern these claims as well. "[S]uch implied consent is…sufficient to establish the applicable choice of law.") (quoting *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 513 n.4 (2d Cir. 2001).

49.  New York law also applies under the State's "center of gravity" approach. *See also* Restatement (Second) of Conflict of Laws § 145 (1971) (law of state with "the most significant relationship" applies for issues in tort). Although the plaintiff worked in Marcum's Philadelphia office, New York has a close connection to this case. Marcum and Citrin are both New York City-based accounting firms. One of the reasons Barbagallo was retained for the Tuscano matter, the account at the center of the present dispute, was because Marcum has an office in close proximity to the client's company headquarters in Bohemia, New York. Def. Ex. 230. In his recruiting pitch for Tuscano's business, Barbagallo used as a selling point the closeness of Marcum's New York office to Tuscano's company headquarters. Tr. 508:15-22. Barbagallo performed important work on the Tuscano matter in document inspection in New York.

50.  New York and all parties have an interest in applying only one state's substantive law to all the controversies arising from the parties' employment contract and between the accounting firms in this case. Picking and choosing the law of different states for different claims is confusing and should be avoided. It ignores the overlap and integration of a state's procedural and substantive laws. A single state's tapestry of the law rather than a patchwork of different state laws is required here. *Cf.* Restatement (Second) of Conflict of Laws § 187 cmt. a (1971) ("[T]he forum may…conclude…that the parties…wish to have the law of a particular state applied."), § 6 ("When there is no such directive, the factors relevant to the choice of the

applicable rule of law include…(g) ease in the determination and application of the law to be applied.").

51.  New York has the most significant relationship to the torts alleged by the parties. Based on the parties' intent, the Agreement's choice of law clause, and the facts of this case, New York law governs all claims.

## V.    Barbagallo's Claims

### A. ERISA

52.  Barbagallo asserts claims under ERISA, arguing that Marcum violated the statute by failing to pay him a retirement benefit and by breaching fiduciary and co-fiduciary duties. Compl. ¶¶ 59-92.  *See* 29 U.S.C. §§ 1132 (a)(1)(B), 1132 (a)(3), 1104, 1105.  He seeks equitable relief under the statute.  These claims are denied.  ERISA does not afford the plaintiff relief.

53.  For the purposes of this issue, it can be assumed without deciding that an ERISA plan can cover one employee.  *Compare Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1376 (7th Cir. 1997) ("We therefore agree with the courts that have decided that, as long as the benefits program meets the other requirements of an ERISA plan—namely, an ongoing administrative scheme and reasonably ascertainable terms—the program does not fall outside the ambit of ERISA merely because it covers only a single employee."), *abrogated on other grounds by Int'l Union of Operating Engineers, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427 (7th Cir. 1998); *Biggers v. Wittek Indus., Inc.*, 4 F.3d 291, 297 (4th Cir. 1993) ("We are not aware of any requirement that [an employee welfare benefit] plan must cover more than one employee in order to be controlled by ERISA.") ; *and Williams v. Wright*, 927 F.2d 1540, 1545 (11th Cir. 1991) ("[W]e conclude that a plan covering only a single employee, where all other requirements are met, is covered by ERISA.") *with Dakota, Minnesota & E. R.R. Corp. v. Schieffer*, 648 F.3d 935,

938 (8th Cir. 2011) ("[A]n individual contract providing severance benefits to a single executive employee is not an ERISA employee welfare benefit plan within the meaning of 29 U.S.C. § 1002 (1).").

54. The evidence demonstrates that ERISA does not apply. Absent from the record is any evidence of a benefit plan, funding for such a plan, or an administrator for its management. *See* Tr. 223-25. Each partner at Marcum, including the plaintiff, entered into his own individualized employment agreement with the firm. This litigation concerns the operation and effect of Barabagallo's special agreement with Marcum; it is not about violations of ERISA. *See e.g.*, *Janover v. Bernan Foods, Inc.*, 901 F.Supp. 695, 699-700 (S.D.N.Y. 1995) ("Although courts have held that an ERISA 'plan' may exist even in cases where it benefits only a single employee….where, as here, the severance benefits were merely incidental to an employment contract, ERISA does not apply."); *Laverty v. Savoy Industries, Inc.*, 954 F. Supp. 86, 89 (S.D.N.Y. 1997) ("[T]he parties simply entered into an employment contract, and did not create an employee welfare or pension benefit plan."); *Jervis v. Elending*, 504 F.Supp. 606, 608-609 (C.D. Cal. 1980) ("[A] contract between an employer and individual employee providing for post-retirement or post-termination in-kind compensation is not a 'plan, fund, or program' within the definitional framework of ERISA….[P]laintiff is…merely seeking redress for an alleged breach of contract.").

55. Barbagallo cannot recover under ERISA. His claims are properly analyzed under New York's law of contracts.

### B. Breach of Contract: Retirement Benefit, PTO, and Commissions

56. Barbagallo asserts that Marcum breached the Agreement by failing to pay him his retirement benefit ($302, 692), unused PTO ($11,895), and client commissions ($4,500) when he

departed for Citrin. In total, he claims damages in the amount of $327,826. Pl. Post-Trial PFFL ¶¶ 81-84.

57. Plaintiff argues that Section 15.1 of the Agreement entitles him to the retirement benefit defined in Article X because it states that Barbagallo receives the benefit if he "withdraws voluntarily from Marcum or is involuntarily terminated." *Id.* ¶¶ 62-63. As to the unused PTO and his client commissions, Barbagallo relies on Article VII of the Agreement ("Paid Time Off") and relevant sections in the employee handbook. *Id.* ¶¶ 86, 97.

58. Marcum argues that Barbagallo is not entitled to any of these payments, in part because of its interpretation of the Agreement. With respect to the retirement benefit, Marcum asserts that Barbagallo did not provide the firm with one year's notice of retirement, as Article X, Section 10.3 of the Agreement requires. Marcum also argues that Article X ("Retirement Earnings Benefit") applies only in the event that Barbagallo retires, not when he resigns to join a competitor firm. *See e.g.*, Def. Post-Trial PFFL at 11-12 n. 4. But Barbagallo asserts that Section 15.1 entitles him to the benefit even when he voluntarily withdraws from the firm. Pl. Post-Trial PFFL ¶¶ 62-63.

59. As to the notice requirement, the plaintiff maintains that since he resigned, he only needed to provide ninety days written notice pursuant to Section 14.1 of the Agreement: "The Non-Equity Partner may terminate his relationship with and services to Marcum upon the giving of ninety (90) days prior written notice…" *Id.* ¶¶ 53-58.

60. There is no need to reach the question of which party's interpretation of the Agreement, particularly which notice provision, governs. As Marcum argues, and convincingly demonstrated at trial, Barbagallo committed a material breach of the Agreement by August 9, 2010, at the latest, terminating the contract from that point onwards and excusing Marcum of any

obligation to pay him retirement benefits, unused PTO, and unearned client commissions when he left the firm.  *See* Def. Post-Trial PFFL at 11-16.

61.  "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."  *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).  *See* Restatement (Second) of Contracts § 237 (1981) ("material failure").  It is a "fundamental principle of contract law that…the material breach of a contract by one party discharges the contractual obligations of the non-breaching party."  *Bear Sterns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F.Supp.2d 283, 291 (S.D.N.Y. 2005).  *See Medinol Ltd. v. Boston Scientific Corp.*, 346 F.Supp.2d 575, 618 (S.D.N.Y. 2004) ("As a general principle of contract law, a material breach excuses the other party's nonperformance.") (collecting cases).

62.  A breach is material in New York if it "go[es] to the root of the agreement between the parties."  *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (internal quotation omitted).  A party's contractual obligation to perform will be excused if "the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract."  *Id.  See* Restatement (Second) of Contracts § 241 (1981) (listing circumstances that are significant for determining materiality of a breach, including "the extent to which the injured party will be deprived of the benefit which he reasonably expected" and "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing").

63.  Conversely, a breach is not material, and the aggrieved party is not excused from performance of its obligations, if the breaching party has substantially performed his end of the

contract.  *See e.g.*, Restatement (Second) of Contracts § 237 cmt. d (1981) ("The considerations in determining whether performance is substantial are those listed in § 241 for determining whether a failure is material.").  "There is no simple test for determining whether substantial performance has been rendered and several factors must be considered, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance."  *Hadden v. Consolidated Edison Co. of New York, Inc.*, 34 N.Y.2d 88, 96 (N.Y. 1974).

64.  Barbagallo materially breached his contract by August 9, 2010, terminating the Agreement on that date and absolving Marcum of its obligations to pay him any unearned benefits when he left the firm approximately three months later.

65.  None of plaintiff's claims had become vested or final by August 9.  They could become final and fixed only if the contract continued in force and plaintiff continued to comply with its terms.

66.  Defendant properly suspended all unearned payments as of August 9, 2010 that might have been due under the Agreement or the Marcum employee handbook.  This included time off, retirement benefits, and client commissions.  None could be justified after the breach.

67.  The plaintiff was willfully disloyal to his employer.  While still an employee of Marcum, he covertly acquired and serviced the Tuscano account.  He billed work for this matter on behalf of his next employer, Citrin.  This account was a substantial one with high prospective revenues.  He deliberately concealed this client from Marcum, despite recruiting the matter as a paid employee of the firm and although his efforts in engaging Tuscano were subsidized by

Marcum. Barbagallo's actions with respect to this matter in the time leading up to and shortly after August 9 collectively establish a major violation of his employment agreement on that date. Cancellation by Marcum as of August 9 was permitted as soon as the employer found out about plaintiff's disloyalty. That cancellation was effective as of August 9, 2010.

68. The evidence demonstrates that Barbagallo had long before August 9 agreed to serve as a forensic expert in the Tuscano matter. He had already sent a Marcum engagement letter to the client in May. That letter was never signed.

69. But on August 9, Barbagallo informed Tuscano that he was leaving Marcum for Citrin. He had resigned from Marcum approximately two weeks earlier. Citrin had received his signed partnership agreement approximately one week earlier. Barbagallo's notice period at Macum, after submitting his letter of resignation, was for at least ninety days, and he had offered to stay longer if necessary.

70. On August 9, the same day he met and informed Tuscano of his future employer, Barbagallo provided Citrin with the client's information so the firm could perform a routine conflict check. Def. Ex. 232 ("[O]ur client would be Richard Tuscano…."). On August 10, Citrin performed the conflicts check and sent Barbagallo the firm's proposed retainer agreement for the Tuscano matter. Barbagallo forwarded the retainer to Tuscano for his signature.

71. By August 10, Barbagallo was formally engaged in the Tuscano matter. He acted as a future partner of Citrin while he was still an employee of Marcum with at least eighty more days remaining in his ninety-day notice period.

72. Barbagallo remained at Marcum for one hundred days after giving notice. During that time, he performed significant work on the Tuscano matter on Citrin's behalf, never disclosing the client or his efforts to Marcum.

73.  At trial, Barbagallo did not deny his grave misconduct with respect to the Tuscano account, providing instead purported justifications of mercy and good feelings towards the new client.  He admitted his behavior constituted a major ethical and professional lapse of judgment:

THE COURT: As I understand the matter, you were then [while employed on the Tuscano matter] working for Marcum?

BARBAGALLO: At that point in time, Your Honor, yes, that's correct.

THE COURT: You were drawing money from Marcum?

BARBAGALLO: Correct.

THE COURT: Your normal draw?

…

BARBAGALLO: Yes, yes, Your Honor.

THE COURT: You had not informed them that you were leaving?

BARBAGALLO: No.  I had informed them that I was leaving.

THE COURT: But you hadn't left?

BARBAGALLO: I hadn't left but I told them I was leaving.

THE COURT: But there hadn't been a definite date fixed for leaving?

BARBAGALLO: There wasn't a definite date fixed.  I had offered anything from zero to ninety or something—something later than 90, if required.  But there wasn't a definite date fixed.  So it could have been anywhere from July 23 until whatever date.

. . .

THE COURT: But you were then working full-time for Marcum, correct?

BARBAGALLO: Correct.  At that point in time, in August [9].

THE COURT: You knew you had an ethical obligation as an employee of Marcum, correct?

BARBAGALLO: I had an ethical obligation at Marcum. My obligation in my mind primarily was to do what I could for Marcum and also to transition, really was my primarily—primary responsibility.

THE COURT: You weren't expecting to work for Citrin while you were working for Marcum were you?

BARBAGALLO: I was—no, Your Honor. I was expecting to work for Marcum until they permitted me to leave. I was ready to leave at any point in time. I would have been happy to leave on July 23. But—

THE COURT: Didn't you recognize your ethical obligation not to at that point solicit—and I don't use the word solicit in any derogatory way—business for Citrin?

BARBAGALLO: Solicit?

THE COURT: Business, new business, for Citrin.

BARBAGALLO: Yes, I mean, I understand. I really wasn't out there, Your Honor, trying to—to go out and solicit business for Citrin. This really came in and it was sort of … a matter that came up. I wasn't at all going out there trying to solicit business for Citrin in any way. This one particular matter came up and I just felt that the overriding factor in my mind in this matter was that Richard Tuscano was a very—I use the word needy in terms of he was a distraught individual. He was going through a lot of difficulty….The overriding consideration there was it really was Richard Tuscano.

THE COURT: That's all commendable and compassion is wonderful. But you were a very hardheaded accountant who had been in the business a long time. Didn't you

recognize your ethical obligation to a present employer above and beyond your sensitivity to this other person? I am hard put to understand it….I understand that accountants, like lawyers, have hearts. We start with that….But they also have heads. I am finding it difficult to understand how you allowed your heart to interfere with what you recognized as an obligation to your then employer.

BARBAGALLO: Well, I guess sometimes I do—there are times that I maybe do things with my heart and not with my head. There have been many times in my life that I have done that before and it—sometimes it has been good and other times it has been bad….I really did not want to be at Marcum. I wanted out of there…And, you know, I guess I was faced with a dilemma….I really couldn't do it and, you know, that was the overriding factor to me.

Tr. 444:13-448:25.

74. As Barbagallo admitted on cross examination, he knew his actions were a willful violation of his duties to Marcum and, had the firm discovered his conduct, grounds for immediate termination:

COUNSEL FOR MARCUM: Section 6.1 [of the Agreement] says: "The Non-Equity Partner, except as otherwise provided in this Agreement or as permitted by the Managing Partner of Marcum, shall devote his exclusive time and efforts to Marcum business. The Non-Equity Partner shall devote his full time, attention, and best efforts to the business of Marcum. Professional and other services rendered by non-equity partner shall be rendered solely for Marcum, and fees earned in connection therewith shall be the property of Marcum." You knew of that provision in your agreement, didn't you?

BARBAGALLO: Yes.

25

COUNSEL FOR MARCUM: And, you did not get the permission of the managing partner to work on the Tuscano matter as a Citrin Cooperman matter, did you?

BARBAGALLO: I did not. I worked on that as I said weekends and after hours. I did not get permission, that's correct.

COUNSEL FOR MARCUM: And so that violated your exclusive duty to Marcum to render services solely for Marcum and to collect the fees that are solely for Marcum, isn't that right?

BARBAGALLO: That's correct.

Tr. 536:7-537:2. *See* Pl. Ex. 1, § 6.1.

....

COUNSEL FOR MARCUM: [Section] 14.3 [of the Agreement]. Says you may be immediately terminated [under] any of the following clauses, and if you turn to page 13, you will see [part] J. It says: "A breach of the non-equity partner's fiduciary duty and/or duty of loyalty to Marcum. For the purposes of this provision, a breach of loyalty or fiduciary duty shall be one in which the Non-Equity Partner has (1) failed to preserve and protect, on Marcum's behalf, its trade secrets, confidences, confidential client lists and/or customer contacts of Marcum, (2) diverted a business opportunity away from Marcum, (3) taken or appropriated for himself an opportunity which otherwise belonged to Marcum, or (4) as such terms are otherwise defined or interpreted in the common law. So set forth right there in your agreement isn't it sir, if you send an opportunity to another firm, or if you divert it for your own purposes, you can be terminated for cause immediately, isn't that right?

BARBAGALLO: That's correct, yes.

COUNSEL FOR MARCUM: That is something that you knew at the time that you were

reading this agreement carefully in 2009 to determine whether or not you were going to

sign it, right?

BARBAGALLO: I'm sure I did. I mean I don't recall every provision now, but I'm sure

I read it.

Tr. 550:19-551:16. *See* Pl. Ex. 1, § 14.3, 14.3(j).

75. Barbagallo's extreme disloyalty to Marcum constituted a material breach of their

Agreement. Fidelity to Marcum was a fundamental premise of their employment relationship

and a basic expectation of Marcum.

76. Barbagallo deliberately concealed the Tuscano matter from his employer knowing

that under the contract he would be immediately terminated for his actions if they were

discovered. He frustrated one of the prime objectives of his employment with Marcum, which

was to devote his accounting services exclusively to the firm while he was employed there.

77. Plaintiffs' egregious conduct occurred within less than a year of joining the firm. It

cannot be said that Barbagallo substantially performed his contract with Marcum after such an

inexcusable breach. *Cf. Hadden v. Consolidated Edison Co. of New York, Inc.*, 34 N.Y.2d 88

(N.Y. 1974) (holding that the utility company could not revoke the pension it had already started

paying the plaintiff, a former vice president, because such an action was prohibited by his

pension contract, and because *his 37 years of service* to the company outweighed his acts of

bribery during the *last two years before his retirement*, constituting substantial performance of

the contract) (emphasis added).

78. Under New York law, once a party has materially breached a contract, the other

party can elect to either "terminate the contract and recover liquidated damages or [it] can

continue the contract and recover damages solely for the breach." *ESPN Inc. v. Office of the Commissioner of Baseball*, 76 F.Supp.2d 383, 387 (S.D.N.Y. 1999) (quoting *Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1011-1012 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996)). This rule assumes that the aggrieved party is aware of the breach and can therefore make a meaningful election of its remedies. *See Bigda*, 898 F.Supp. at 1013 ("Of course, a non-breaching party cannot be found to have elected to continue the contract in the face of a breach unless he knew of the breach."). *See also* Restatement (Second) of Contracts § 237 cmt. c (1981) ("Ignorance [is] immaterial….[O]ne party's material failure of performance has the effect of the non-occurrence of a condition of the other party's remaining duties, under the rule stated in this Section, even though that other party does not know of the failure.").

79. Although the Agreement terminated on August 9, Marcum's continued employment relationship with Barbagallo for approximately the next three months is not evidence of an election of remedies to retain the contract in force. Marcum did not know of Barbagallo's material breach at the time because of the plaintiff's covering of his treachery. It did not learn of Barbagallo's conduct with regards to the Tuscano matter until discovery proceedings in this litigation, well after Barbagallo had left the firm. Marcum's Consolidated Mem. of Law in Opp. to Mots. for Summ. J., at 15 n. 10, Oct. 19, 2012, ECF No. 134. Marcum's employment relationship with Barbagallo between August 9 and November 1, 2010, when ignorant of Barbagallo's material breach, does not demonstrate that the firm meaningfully chose to continue, rather than terminate, the contract. *See* Pl. Post-Trial PFFL ¶¶ 270-74.

80. Barbagallo does not have a breach of contract claim against Marcum for his retirement benefit, PTO, or client commissions. His material breach of the employment agreement on August 9, 2010 terminated the contract as of that date, excusing Marcum from

performing any continuing obligations under their Agreement. Plaintiff was not employed under a contract when he worked for Marcum after August 9, 2010. He cannot recover for any benefits set out in the Agreement or the employee handbook when he left the firm almost three months later.

81. Barbagallo asserts that, pursuant to the 2009 Marcum Philadelphia Office Employee Handbook ("Handbook"), he is entitled to $4,500 in commissions for his origination of two client matters and his work on them.

82. The Handbook does not apply to partners in Marcum's Philadelphia office. The testimony of David Glusman, managing partner of that office, demonstrated that the Handbook applies only to employees up to the level of senior manager, and not partners. Tr. 804:3-24.

83. Even were the Handbook to apply to commissions, it does not create a contractual right to a commission. It makes an employee *eligible* for one depending on his role in bringing the matter to the firm and working on the account. Ex. 93, at 23. According to the handbook, "[t]he ultimate decision as to whether a bonus is payable will be made by the Managing Partner." *Id.*

84. The court credits the testimony of David Glusman, managing partner of the Philadelphia office, that Barbagallo was adequately compensated for his commissions with respect to both accounts at issue. Tr. 769-73. *See* Marcum's Pre-Trial Proposed Findings of Fact and Conclusions of Law ("Def. Pre-Trial PFFL"), at 12-13, Nov. 26, 2012, ECF No. 162 . For one of the matters Barbagallo billed less than three hours of his time, had a very minor role on the account, and was not qualified to perform the required audit work. Tr. 771; Def. Ex. 268. Marcum paid the plaintiff what he was due for his work and origination efforts for both accounts. Tr. 769:8-14. He cannot collect any additional commissions.

85.  The plaintiff is not entitled to a payout for any unused PTO.  Barbagallo argues that his right to such a payment, in the amount of $11,895, stems from Section 7.1 of the Agreement.  He asserts that this section incorporates the policies of the employee handbook on the issue of a payout for unused PTO.  Pl. FFL ¶¶ 85-96.  *See* Pl. Ex. 1, § 7.1.  The Handbook does entitle an employee to payment for accrued PTO days up to the last month worked if the employee resigns with proper notice or is terminated.  Pl. Ex. 93, at 31.

86.  But Section 7.1 of the Agreement does not incorporate the Handbook's provisions on this issue.  It states:

> The Non-Equity Partner shall be entitled to reasonable periods of paid time off ("PTO"), as determined in advance by Marcum; however, in no event shall such PTO be less than that afforded to a "Senior Manager" at Marcum in accordance with the standard policies of Marcum, a copy of which has been furnished to the Non-Equity Partner prior to the execution of this Agreement.

Pl. Ex. 1, § 7.1.

87.  As the language of this section demonstrates, the Agreement refers to the Handbook (the standard policies of Marcum) in order to more precisely define the term "reasonable periods of paid time off" as used in Section 7.1.  The Agreement explains that Barbagallo will not receive PTO less than that afforded a senior manager pursuant to the Handbook.  That is the only reference to the Handbook in this section.  Section 7.1 does not incorporate the Handbook's policies with regards to payment for unused PTO.  Having breached the Agreement by his treachery, it was hardly to be expected by plaintiff that Marcum would create a new fixed benefit for Barbagallo for his *unused* PTO.

88.  Even if the Handbook were to apply to partners generally and on this specific issue— which it does not—it does not provide plaintiff with a remedy in contract for *unused* PTO.  It

states on the first page: "[T]his handbook only should be considered as a set of guidelines and not be regarded as a 'contract' or guarantee of any kind of particular treatment." Pl. Ex. 93, at 1.

89. Barbagallo cannot collect damages for unpaid commissions or time off under the contract.

## VI. Marcum's Counterclaims

### A. Breach of Contract

90. Marcum asserts that Barbagallo violated Section 13.1 of the Agreement by failing to pay the contractually required fee for taking Marcum clients with him to Citrin. Amended Ans.¶ 163. Section 13.1 is a liquidated damages provision for the two-year non-compete covenant in the preceding section of the agreement. Def. Post-Trial PFFL, at 16; Pl. Ex. 1, § 12.1 ("[T]o the extent that payment is made to Marcum by the Non-Equity Partner as provided in Article XIII herein…."). It allows Barbagallo to take Marcum business with him to a competitor firm if he compensates Marcum for any departing client. Section 13.1 states in pertinent part:

> The Non-Equity Partner recognizes and acknowledges that the relationships which the Non-Equity Partner may and will develop with the clients of Marcum are legitimate interests of Marcum, entitled to protection, and that the services provided to Marcum and its clients are deemed to be unique and/or extraordinary, particularly to the extent that the Non-Equity Partner will have access to and be s*ervicing clients of Marcum obtained at great effort and expense of Marcum.* As such, Marcum and the Non-Equity Partner agree that Marcum is entitled to protection against the Non-Equity Partner from exploiting or appropriating the *goodwill of Marcum's clients with whom the Non-Equity Partner acquires a relationship with during his/her relationship with and services to Marcum.* In addition, the Non-Equity Partner acknowledges that Marcum is entitled to protection against the Non-Equity Partner from exploiting or appropriating the *goodwill of those clients of Marcum which were recruited by the Non-Equity Partner during his/her relationship with and services to Marcum and which may have come solely to avail themselves of the Non-Equity Partner's services provided that the foregoing recruitment efforts by the Non-Equity Partner were, directly or indirectly, subsidized by Marcum.*

Pl. Ex. 1, § 13.1 (emphasis added).

91.  The clause provides a formula for the payment that Barbagallo must make to Marcum if any "clients [that he] serviced or consulted during [his] tenure at Marcum" follow him to competing employment.  Pl. Ex. 1, § 13.1; Def. PFFL, at 16.  The fee is 125% of the billings to that client in the twelve months prior to the plaintiff's departure.  Pl. Ex. 1, Section 13.1; Def. PFFL, at 16.  Marcum seeks damages under this provision in their post-trial proposed findings in the amount of $219,991.67, or alternatively, $34,651.03, depending on how many clients the court determines were wrongly taken.  Def. PFFL, at 19; Tr. 837-38.  The difference is irrelevant since no such claims are valid.

92.  New York law recognizes that an "employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which *had been created and maintained at the employer's expense*, to the employer's competitive detriment."  *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392 (N.Y. 1999) (emphasis added).  In *BDO Seidman*, an accountant was sued by his former employer for violating his restrictive covenant.  Similar to the agreement in the present case, the parties' contract contained an eighteen-month non-compete clause.  *Id.* at 387-90.  But the clause allowed the defendant accountant to service clients of his former employer within those eighteen months after the termination of his employment if he compensated his former firm accordingly.  *Id.*  Construing the agreement as one containing a restrictive covenant and a liquidated damages provision—just as in the present case—the New York Court of Appeals upheld the validity of the clause, remanding as to the appropriateness of the formula for damages.  *Id.* at 393-97.  It did, however, limit the application of the covenant, holding that it did not apply to "clients with whom [the accountant] never acquired a relationship through the direct provision of substantive accounting services."  *Id.* at 393.  "[I]t would be unreasonable to extend the covenant to personal clients of

defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which [the accountant's former employer] neither subsidized nor otherwise financially supported as part of a program of client development." *Id.*

93. Unless the employment contract provides otherwise, employees do not run afoul of a firm's non-compete clause where their relationship with the client pre-dated employment with the firm, or where they retained business through their own independent efforts, unassisted by the firm. *See e.g.*, *Good Energy, L.P. v. Kosachuk*, 49 A.D.3d 331, 332 (1st Dep't. 2008) (finding the non-compete clause unreasonable because, among other reasons, it prohibited the individual from working with clients who followed him to his former employer due to his "pre-existing relationship" with them); *Nebraskaland, Inc. v. Brody*, No. 09 Civ. 9155 (DAB), 2010 WL 157496, at *3 (S.D.N.Y. Jan 13, 2010) (refusing to enforce restrictive covenant in the employment agreement to the extent that the defendant had a "pre-existing relationship" with his customers); *Frank Crystal & Co.*, 84 A.D.3d 704, 705 (1st Dep't. 2011) ("The client was developed…independently and without the assistance from plaintiff."). *But see Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F.Supp.2d 525, 536 (S.D.N.Y. 2004) (finding restrictive covenant enforceable even for clients with whom the defendant employee had a pre-existing relationship from a prior firm because the plaintiff employer purchased the firm, including its client relationships and goodwill); *Weiser v. Coopersmith*, 74 A.D.3d 465, 467-68 (1st Dep't. 2010) (enforcing restrictive covenant and liquidated damages provision for clients acquired in a merger because the employer agreed to assume liabilities and obligations of the purchased firm in exchange for individual partners agreeing to bring their clients to the employer and to be bound by the non-compete clause when seeking new employment).

94. In professional matters, sensible clients follow the talent they trust, and not the organizations to which that talent is temporarily attached. Clients are not dragged against their will from one firm to another, but actively choose who they will retain for professional services. The trial testimony, and the movement of the plaintiff and his clients between the three organizations in this case, support this principle in the accounting field in the present case. For example, Gary Karlitz, the practice leader of Citrin's valuation and forensic group, testified on direct and cross examination:

> KARLITZ: I would say it is really about the client. If the client wants to stay with Citrin Cooperman, they stay with Citrin Cooperman. If they want to follow the expert, they follow the expert. As a rule, they should follow the expert unless they opt otherwise.
>
> ...
>
> The way I would say it in my words…is that the client has the ultimate decision and the client follows who they want to have as their expert and it's up to the client to decide do I want Marcum to represent me or do I want Joe Barbagallo to represent me. It's up to the client. That's how I look at it from the view that I'm at.

Tr. 394:5-9; Tr. 402:4-9.

95. It is assumed without deciding that, as Marcum argues, Section 13.1 of the Agreement would survive the termination of the contract on August 9, 2010. Def. Post-Trial PFFL, at 16. Applying the law and the common knowledge about clients and their selection of professional services to the facts of this case, Marcum does not have a claim against Barbagallo for a breach of contract on this ground. Barbagallo had pre-existing relationships with all the clients levitated from Marcum to Citrin, except for one account—to which he billed no work in

his last year at Marcum and would therefore not owe any compensation under Section 13.1 of the Agreement.

96. The court in a bench trial is in the position of a juror who must apply his or general knowledge of life to the facts at hand in making necessary inferences. This is not judicial notice, but necessary inferential reasoning. *See* Fed. R. Evid. 201 (judicial notice of adjudicative acts); John H. Mansfield et al, Evidence: Cases and Materials 9 (9th ed. 1997) ("Since so much of the evaluation of evidence depends upon varying hypothesis applied by triers with different backgrounds and views of life, fact finding differences among jurors and between judge and jury are to be expected.").

97. The evidence at trial established that Barbagallo brought to Margolis his clients from his prior practice. Tr. 754-57; Def. Ex. 265. While at Margolis, by his sole efforts he added six new clients to his portfolio. Tr. 757-59. They came, along with clients from his earlier individual practice, to Marcum. Tr. 759. Of the clients Barbagallo then took with him from Marcum to Citrin, only one of them was acquired by the plaintiff *during* his time at Marcum— Dorothy Snyder. Tr. 760-61; Def. Ex. 262. He had pre-existing, independent relationships, from Margolis and when he was self-employed, with all the other clients he took to Citrin. Tr. 813-15; Pl. Post-Trial PFFL ¶ 182.

98. For the purposes of Section 13.1 and the compensation Barbagallo owes Marcum under this provision, Snyder is the only relevant account.

99. In the year before Barbagallo left for Citrin, no work for the Snyder account was billed. Pl. Post-Trial PFFL ¶ 183; Pl. Ex. 130.

100. Pursuant to the formula in Section 13.1, which determines payment based on the billings to the client in the twelve months before departure, Barbagallo does not owe any damages to Marcum for client retention.

101. Marcum argues that it acquired the rights to Barbagallo's Margolis clients when it acquired that firm's assets. *See* Def. Post-Trial PFFL, at 17-18. *See also Johnson Controls*, 323 F.Supp.2d at 525, 536; *Weiser*, 74 A.D.3d at 465, 467-68. Even accepting the defendant's position, the language of the contract compels a result contrary to the one it seeks.

102. Section 13.1 explicitly limits liquidated damages to the protection of clients Barbagallo "acquires a relationship with during [his] relationship with and services to Marcum" or who were "recruited by [Barbagallo] during his/her relationship with and services to Marcum." The only client with whom Barbagallo acquired a relationship during his time at the firm and then took to Citrin was Dorothy Snyder. Neither Barbagallo nor Marcum billed the Snyder account in the year before his departure from Marcum. Under the Agreement, plaintiff does not have an obligation to compensate Marcum.

## B. Breach of Loyalty and Fiduciary Duty

103. Marcum claims that Barbagallo breached his duties of loyalty and fiduciary duties to the firm by diverting the Tuscano matter to Citrin. It seeks to recover his compensation during the period of disloyalty; the value of his billable work for Tuscano while he was still at Marcum; and liquidated damages under Section 13.1 of the Agreement for his taking the account to Citrin. *See generally* Def. Pre-Trial PFFL, at 21. Def. Post-Trial PFFL, at 21. Details of these claims shifted during the trial. But the differences are irrelevant since the claims are meritless.

104. An employee who breaches his fiduciary duties to an employer is required to forfeit all of his salary during the period of disloyalty. *Design Strategy, Inc. v. Davis*, 469 F.3d 284,

301 (2d Cir. 2006) (citing *Phansalker v. Anderson Weinroth & Co.*, 344 F.3d 184, 208-208 (2d Cir. 2003)). If the employee received his compensation on a task-by-task or commissioned basis, the law limits forfeiture to the particular transactions at issue during his period of disloyalty. *Phansalker*, 344 F.3d at 205-207. *See Design Strategy*, 469 F.3d at 301-302.

105. Barbagallo breached his fiduciary duties to Marcum by undertaking the Tuscano account. But there are no damages for Marcum to recover under the contract, either for the billable work plaintiff performed for this account in October or for the liquidated damages under Section 13.1 of the Agreement —because no contract existed when Barbagallo did significant work on this matter.

106. As Marcum established at trial, Barbagallo's material breach of the contract by August 9, 2010 terminated the Agreement. The plaintiff was no longer a contract employee of Marcum after that date. He worked until October 31, 2010 without a contract.

107. Plaintiff earned his compensation during these approximately three months on a *quantum meruit* basis. It was during this period that he began performing billable work on the Tuscano matter. The first time billable work was performed for Tuscano was on October 1, 2010. Tr. 299:6-18; Tr. 30; Def. Ex. 257. Tuscano paid the retainer to Citrin in early October, and the document inspection also occurred about this time. Tr. 31, 312:4-10; Def. Ex. 257. Tuscano received his first invoice for this matter in November of 2010, a billing for the October work. Tr. 296:20-297; Def. Ex. 257. By October, Barbagallo had been working at Marcum without a contract for at least two months. As a result, Marcum cannot recover damages under a contract that did not exist.

108. When an agreement is unenforceable or there is no contract, a party may recover for services performed on a quantum meruit basis. *See e.g.*, *Clark-Fitzpatrick, Inc. v. Long Island*

*Railroad Co.*, 70 N.Y.2d 382, 388 (N.Y. 1987) ("A 'quasi contract' [quantum meruit] only applies in the absence of an express agreement, and is…a legal obligation imposed in order to prevent a party's unjust enrichment."). *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994) ("In the absence of a contract that had become effective, [plaintiff] is entitled to *quantum meruit* recovery…. *Quantum meruit* is a doctrine of quasi contract."). A party's compensation under this doctrine is measured by the reasonable value of the services provided. *Gould v. Lightstone Value Plus Real Estate Investment Trust, Inc.*, 301 Fed.Appx. 97, 97 (2d Cir. 2008) ("In order to recover in quantum meruit under New York law, a claimant must establish…the reasonable value of the services.") (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)).

109. Marcum cannot clawback any of Barbagallo's compensation between August and November of 2010 for the breach of fiduciary duties. The plaintiff is entitled to whatever he earned on a quantum meruit basis. After providing his notice of resignation and until his departure date, Barbagallo performed significant work for Marcum unrelated to the Tuscano matter, including collecting account receivables, issuing bills, performing tax and accounting work, and transitioning clients who were to stay at the firm after he left. Tr. 425-30, 647-51.

110. Plaintiff testified that the reasonable value of these services on the open market was more than $50,000—almost precisely the amount he would have earned in compensation from August 9 to October, 31, 2010 under the Agreement, were it then in force. Tr. 649-50, 829-30. Barbagallo's testimony on this point is credited. A highly experienced accountant with almost forty years in practice, he knew the work he did during this time and the market value of his services. The testimony in opposition was not based on any observation of plaintiff's work and cannot be credited.

38

111.  Theoretically, it could be argued that since the plaintiff was on Marcum's payroll while working on the Tuscano account, Marcum could recover for that work.  But David Glusman, the managing partner of Marcum's Philadelphia office, rejected that alternative in favor of declaring the contract void.  Glusman made clear in his testimony that he would have immediately terminated Barbagallo had he known of this material breach of the contract when it occurred.

> COUNSEL FOR MARCUM: Had you known that Mr. Barbagallo worked on the Tuscano case, while he was employed by Marcum, getting paid by Marcum, what if anything would you have done?
>
> …
>
> GLUSMAN: Well, I am sure that I would have been flabbergasted and furious….I would probably have told him that he was no longer a Marcum employee of that moment.  I would have considered that to be an absolutely a breach of his responsibility as a partner to the firm, under the terms of the agreement, and under any premise that I have ever worked in, any organization with somebody that I viewed as a partner or a co-owner.
>
> THE COURT: As I understand it, you would have considered that a breach, a major breach of the contract ending his rights as an employee under the existing contract?
>
> GLUSMAN: With the caveat Your Honor that I unfortunately have to make a lot, I can't give a legal opinion.  From my perspective as the partner in charge of that office, I would have made that conclusion at that moment.

Tr. 729:24-730:22.

112.  Marcum cannot recover on its claim for breach of loyalty and fiduciary duties.  It did not suffer any compensable damages.

### C. Marcum's Remaining Claims: Negligence and Reformation

113. Marcum claims that Barbagallo was negligent in issuing bills to clients and collecting on outstanding accounts receivables. This claim is dismissed. In New York, an employer cannot sue an employee for negligence or poor performance. *E.g.*, *Burke v. Steinmann,* No. 03 Civ. 1390 (GEL), 2004 WL 1117891, at *6 (S.D.N.Y. May 18, 2004) ("[U]nder New York law employers may not assert a claim of damages against an employee for the employee's alleged negligent acts, or sue employees for lost profits caused by alleged poor performance.") (citing N.Y. Lab. L. § 193); *Gortat v. Capala Bros., Inc.*, 585 F.Supp.2d 372, 375-76 (E.D.N.Y. 2008) (collecting cases); *Nowicki v. Toll Brothers, Inc.*, 10-CV-4877 (CBA)(JO), 2012 WL 14258, at *1 (E.D.N.Y. Jan. 4, 2012) (same). Marcum's evidence of Barbagallo's negligence is insubstantial and is not credited. No partner in Marcum's Philadelphia office collected all of his or her outstanding accounts receivable, and the firm has not sued any partner, except Barbagallo, for uncollected bills. Tr. 473:23-475:3, 823:8-10.

114. Marcum's claim for reforming Section 15.1 of the Agreement—so it states that Barbagallo shall *not* receive his retirement benefit if he voluntarily withdraws from the firm—is dismissed. Marcum has failed to provide any credible evidence of a scrivenor's error.

115. No other claim of either party has merit.

## VII. Conclusion

116. Barbagallo's claims for retirement benefits, paid time off, commissions, and other damages are denied. All of Marcum's claims are denied. No costs or disbursements are awarded.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   January 9, 2013
        Brooklyn, New York